**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0629n.06

**Nos. 07-2009, 07-2055**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| NIRANJAN LAL, ) | |
| ) | |
| Plaintiff-Appellee Cross-Appellant ) | |
| ) | ON APPEAL FROM THE |
| v. ) | UNITED STATES DISTRICT |
| ) | COURT FOR THE WESTERN |
| UNITED STATES LIFE INSURANCE COMPANY ) | DISTRICT OF MICHIGAN |
| ) | |
| Defendant-Appellant Cross-Appellee ) | |
| ) | |
| ) | |

**BEFORE: MERRITT, ROGERS, AND WHITE, Circuit Judges.**

**ROGERS, Circuit Judge.** Niranjan Lal obtained a judgment that U.S. Life wrongfully refused to pay him disability benefits under an insurance contract. U.S. Life appeals, claiming that coverage under the contract terminated when Michigan briefly suspended Lal's license to practice medicine several years before the onset of Lal's disability. Because that conclusion is required by the most natural reading of the contract, judgment for Lal was not warranted.

**I.**

Lal, a nephrologist (kidney doctor), is a citizen of Michigan. U.S. Life is a New York corporation with principal place of business in New York. Lal's membership in the AMA made him eligible for a disability insurance policy underwritten by U.S. Life, under which coverage began in

1983. The insurance policy required U.S. Life to pay income replacement benefits if Lal became disabled while the policy was in force.

The policy provided that coverage would end "upon the suspension or revocation in any state of [Lal's] license to practice medicine as a result of a criminal act, ethical violation, or gross malpractice . . . ." The insurance contract also stated that it was governed by Illinois law.

In April 1996, Michigan police received a tip that Lal might be wrongfully prescribing painkillers. Throughout the remainder of 1996 an undercover officer posed as a patient and repeatedly requested that Lal give him prescriptions for Vicodin. By the time Lal finally refused to continue prescribing Vicodin for the undercover officer in December, Lal had written prescriptions for a total of 500 Vicodin pills, notwithstanding statements from the undercover officer such as that the officer "just wanted to get some more Vicodin," that his pain was gone but he "just liked having [the Vicodin] around," and even that the officer was selling the drug for $5 per pill.

On March 27, 1997, Michigan's Department of Consumer & Industry Services, Board of Medicine and Disciplinary Subcommittee ordered that Lal's license to practice medicine in Michigan be summarily suspended. The order was to take effect "commencing the date [it was] served upon" Lal. Shortly after service of the order on March 31, Lal petitioned for and received an order from the county circuit court that stayed the suspension order subject to limits on Lal's ability to prescribe narcotics.

Michigan pursued criminal charges, and eventually obtained a jury verdict against Lal for "three counts of delivery of a prescription form" and a sentence of eighteen months of probation. The conviction occurred in March 1999; the Michigan Court of Appeals affirmed in November 2000.

After Lal's conviction, the Michigan medical regulatory establishment conducted various administrative proceedings. Eventually, on January 17, 2003, the Michigan Board of Medicine Disciplinary Subcommittee issued an order that fined Lal $5000 and suspended his license to practice medicine for six months and one day, effective 30 days after the order was signed. This suspension took effect on February 16, 2003. The medical licensing board restored Lal's license on October 9, 2003.

Meanwhile, Lal's chronic pancreatitis worsened. Serious attacks sent him to hospital emergency rooms in 1999, 2000, and 2001. Lal testified that his pancreatitis was under control from 2001 until early 2003. But in January 2003 his condition took a turn for the worse, and at the beginning of February his condition became so bad that he ceased working. Lal's physician found that Lal was disabled from practicing medicine as of February 4, 2003.

Lal filed for disability benefits under his insurance contract with U.S. Life. U.S. Life concluded that coverage had terminated because of the 1997 suspension and refused to pay, though it did refund the premiums Lal had paid for coverage since 1997.

Lal filed a two-count complaint against U.S. Life in Michigan court. Lal claimed that U.S. Life breached the insurance contract by withholding payment for his valid claim of disability and that its failure to pay violated Michigan's Uniform Trade Practices Act. U.S. Life removed in December

2005. In December 2006, the district court denied U.S. Life's motion for summary judgment and found that as a matter of law Lal's license to practice medicine was first suspended so as to terminate the insurance contract on February 16, 2003, rather than in 1997.

The district court conducted a bench trial in June 2007. The court concluded that Lal became unable to work as a physician as of February 4, 2003. The court further found that U.S. Life breached its contract because Lal met all necessary conditions under the policy, including that he was under the regular care of a physician for his disability. The court held that U.S. Life was not liable under the Michigan Uniform Trade Practice Act because, under then-governing precedent, claims "reasonably in dispute" were not subject to the 12% interest penalty provided by that Act for late payment.

Lal appeals, claiming that a subsequent change in Michigan law requires that he receive a 12% interest rate on his judgment. U.S. Life also appeals, claiming that Lal was not under the regular care of a physician for his disability as the contract requires, and that the contract terminated in 1997 when Michigan suspended Lal's license. The last issue is dispositive.

## II.

The 1997 suspension of Lal's license, though short-lived, was sufficient to trigger the termination clause in the contract and thus requires judgment for U.S. Life.

The contract term at issue provides that coverage ends "upon the suspension or revocation in any state of [Lal's] license to practice medicine as a result of a criminal act, ethical violation, or gross malpractice . . . ."

The 1997 suspension went into effect after Lal received service of the order of summary suspension on March 31, 1997. Later that day, the state circuit court entered an order:

Ex Parte Order Staying the Order of Summary Suspension

This matter having come before the Court on a Petition for Ex Parte Order to Stay the Order of Summary Suspension and the Court having been fully advised in the premises, IT IS HEREBY ORDERED as follows:

The Order of Summary Suspension filed in the above captioned matter on March 27, 1997, bearing Complaint Number 43 97 0316 00 is hereby stayed until *April 14, 1997 at 1:30 p.m. hearing on this petition. Petitioner shall not prescribe any narcotic or pain medicine.* [italicized material handwritten]

All further proceedings until 2003 did not result in the suspension of Lal's license. Such proceedings as occurred in other agencies do not shed light on the legal reasoning behind the circuit court order.

The unambiguous language of the contract said that Lal's contract terminated once his license was suspended for ethical violations. Nothing in the language suggests that an extremely short period of suspension is not sufficient to trigger termination.

Lal does not argue that the contract language is ambiguous, though if the language were ambiguous it would be interpreted in his favor. *See Aurelius v. State Farm Fire & Cas. Co.*, 894 N.E.2d 765, 769 (Ill. App. Ct. 2008). Rather, Lal argues that the language is unambiguous in his favor. But Lal's claim that the state merely "took action" to suspend his license in 1997 rather than "suspending" it cannot be reconciled with the unambiguous meaning of those terms, particularly

given that the contract refers to both suspension and revocation. Lal's argument implies that only revocation would terminate coverage, a position not reconcilable with the language of the contract.

Lal argues that the provision should be read as not immediately terminating coverage if the state suspends a license wrongfully or without legal justification. But whether or not such a liberal reading is warranted, in this case Lal had committed ethical and criminal violations before the 1997 suspension. The only thing that suggests that the 1997 suspension was improper is the state court's stay of that suspension—but that court did not provide its reasoning in staying the suspension, and the record as a whole provides no reason to conclude that the state acted wrongfully by suspending Lal's license in 1997.

In refusing U.S. Life's motion for summary judgment below, the district court evidently concluded that the state court stayed the suspension nunc pro tunc, effectively "unsuspending" Lal retroactively for the few hours between the suspension taking effect and the entry of the stay. But the order did not explicitly say that it acted retroactively and gave no reason to assume that it so acted. Even if the court were to have issued its order with the intent of retroactively shielding any unlicensed practice of medicine Lal may have committed on March 31, it is hardly clear that the court could ex parte reinstate Lal's coverage with U.S. Life in contravention of the terms of his contract.

Because coverage terminated once the state suspended Lal's license, the district court should have granted summary judgment to U.S. Life. The remaining issues raised on appeal and cross-appeal are therefore moot.

## III.

For these reasons, we reverse the judgment of the district court.

**WHITE, Circuit Judge, dissenting.** I respectfully dissent, and would affirm.

The order of summary suspension ordered that Lal's license to practice medicine in Michigan "shall be and hereby is summarily suspended commencing the date this order is served upon Respondent." The order was served on Lal on March 31, 1997. On that same day, a circuit court stayed the order until it could hold a hearing. On April 7, the court entered an amended order staying the order of summary suspension until after hearing and decision by the administrative agency. On July 30, an Administrative Hearing Officer signed a stipulated order lifting the order of summary suspension and restricting Lal's authority to prescribe and dispense narcotic medication, pending a final determination by the Disciplinary authority. The July 30 order was amended on August 28. The Board of Medicine Disciplinary Subcommittee entered its Final Order on January 17, 2003, suspending Lal's license for six months and one day. The order stated "this order shall be effective 30 days from the date" of signing.

On the basis of these facts, the district judge concluded that the circuit court's order staying the order of summary suspension operated to preserve the status quo, "the last, uncontested status preceding commencement of the controversy[,]" *Lal v. United States Life Ins. Co.,* No. 1:05-CV-853, 2006 WL 3542670, at *3 (W.D. Mich. Dec. 7, 2006), citing *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir.1976), and that Lal's license was not effectively suspended on March 31, 1997. Thus, the court concluded, the policy remained in effect until February 16, 2003, the effective date of the suspension. The majority rejects this reasoning, concluding instead that Lal's license was

suspended from the time the order of summary suspension was served until the stay order was entered, and that this suspension triggered the termination clause. I would affirm the district court.

The policy states:

**TERMINATION - Date Insurance Ends**

Your insurance will end on the earliest of:

1. the date the group policy ends;
2. the end of the period for which the last premium has been paid by you;
3. the date you retire;
4. the certificate anniversary coinciding with or next following the date you attain age 75;
5. the date you cease to be an Eligible Member and not Actively at Work;
6. upon the suspension or revocation in any state of your license to practice medicine as a result of a criminal act, ethical violation, or gross malpractice; or upon your surrender of your license to practice medicine in any state prior to, during, or in lieu of any medical licensure board inquiry, investigation or other action pertaining to a criminal act, ethical violation, or gross malpractice**.**

Although the terms "actively at work" and "retired" are defined by the policy, "suspension" and "revocation" are not. Nevertheless, all the terminating events contemplate either that the policy expires or that the insured is no longer covered due to age or inactivity. It is not clear that Lal's license was suspended on March 31, 1997, even for a brief period of time.

Although the policy does not use the term "final suspension," it also does not use the term "take action to suspend." The term "suspension" connotes that one's privilege to practice has been abrogated or withheld. Had the Board of Medicine decided on a lesser sanction in its Final Order, one could certainly have debated whether Lal's license was ever suspended at all under the policy.

The order of summary suspension stated that Lal's license would be suspended "commencing the date [the] order is served;" it did not state "upon service." A court of competent jurisdiction stayed the order the same date it was served. Thus, even by the terms of the orders, it is unclear whether Lal's license was ever suspended. The district court concluded that the effect of the stay was to preserve "the *status quo* so that Lal's license was not suspended pursuant to the Order of Summary Suspension." *Lal*, 2006 WL 3542670, at *3. Given the timing of the orders, this was a sound conclusion. While the Board of Medicine took action to summarily suspend Lal's license, that action was stayed by the court. Notwithstanding the order of summary suspension, as a consequence of the circuit court's order, Lal's license continued to be in effect until it was suspended on February 16, 2003. I would affirm.